1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

   OX LABS, INC.,                    )
6                                    )
              Plaintiff,             )
7                                    )
                   vs.               )
8                                    )   2:18-CV-5934-MWF
   BITPAY, INC., et al.,             )
9                                    )
              Defendants.            )
10   _____)

11

12
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
13
                        Los Angeles, California
14
                      Thursday, January 16, 2020
15

16

17
                   _____
18

19

20

21

22                      AMY DIAZ, RPR, CRR, FCRR
                        Federal Official Reporter
23                      350 West 1st Street, #4455
                        Los Angeles, CA 90012
24

25        *Please order court transcripts here:  www.amydiazfedreporter.com*


                 AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
1     APPEARANCES OF COUNSEL:

2

      For the Plaintiff:
3

4                       LEIDER & AYALA-BASS LLP
                        By:  Philip Leider, Attorney at Law
5                       Spear Tower
                        One Market Plaza 36th Floor
6                       San Francisco, California 94105

7

8
      For Defendants:
9
                        RUSS AUGUST & KABAT
10                      By:  James Tsuei, Attorney at Law
                        12424 Wilshire Boulevard 12th Floor
11                      Los Angeles, California 90025

12
                        MORRIS MANNING & MARTIN LLP
13                      By:  Lawrence Kunin, Attorney at Law
                        3343 Peachtree Road NE Suite 1600
14                      Atlanta, Georgia 30326

15

16

17

18

19

20

21

22

23

24

25
```

```
1              THE CLERK:  Calling item number four, case number
2       CV-18-5934-MWF, Ox Labs, Inc. vs. Bitpay Inc., et al.
3              Counsel, please rise and state your appearance for
4       the record.
5              MR. LEIDER: Good morning, Your Honor.  Philip
6       Leider, Leider & Ayala-Bass, for Plaintiff Ox Labs, Inc.
7              MR. TSUEI: Good afternoon, Your Honor.  James Tsuei,
8       and with me on the phone is lead counsel Lawrence Kunin.
9              THE COURT:  Mr. Kunin, are you here?
10             MR. KUNIN: I am, Your Honor.
11             THE COURT:  Good afternoon, counsel.
12             What you are arguing about, counsel, obviously is
13      the appreciation in the value of the Bitcoins.  In that *Horn*
14      case, the Ninth Circuit said in a case where it was stock
15      certificates, well, the defendant could just give them back,
16      which the defendant was eager to do because they had declined
17      in value.
18             Here, you know, I guess there were all these
19      questions left over from last time, but the thrust of all of
20      that was I really was feeling this was more of an issue of
21      law than one of fact, but now the defense has kind of thrown
22      out something which may or may not be disputed, may or may
23      not be raising issues of fact, and this is the idea that on
24      the three exchanges there was a, in fact, a complete
25      liquidation.
```

1           And I don't know if the plaintiff accepts that as

2    being true.  I don't know that really the parties have

3    entirely briefed what the legal effects of that are, just as

4    a former prosecutor, I have -- there is an intuitive sense

5    that with money, or tainted money, you know, money from a

6    criminal enterprise or that was laundered, it's first in,

7    last out, but if in fact it's all out, then it's all out.

8           So I understand where the defense is coming from on

9    that, but I don't necessarily know what the facts and the law

10   are on this, and I frankly don't think this was really a fact

11   that was being raised or addressed in the last go around.

12          And then on, you know, *Stockton vs. Verizon*, we've

13   got this Ninth Circuit opinion where it says that at least

14   there they said, look, you know, there is -- once it became

15   clear that the property was not going to be returned, then

16   the plaintiff should have gone out and purchased the property

17   in regard to that.  And of course, if the plaintiff had done

18   that here, then the plaintiff would be enjoying the fruits of

19   the appreciation.

20          You know, it's easy to be sympathetic to the

21   plaintiff here, except for the fact that the plaintiff caused

22   the whole situation to arise in the first place.  But on the

23   other hand, the plaintiff did cause the whole situation to

24   arise in the first place.  And second, it could be argued

25   that the plaintiff wants to -- is saying how terrible the

1    situation is, but that is easy to do with the hindsight of

2    knowing that Bitcoin went up in value.

3         So with that, let me ask the plaintiff to address

4    some of the questions that I've had and then some of the

5    points that I tried to lay out in the tentative.

6         MR. LEIDER: Yes, Your Honor, I would be glad to.

7         THE COURT:  Yeah.

8         MR. LEIDER: Would you like to start with any

9    specific question or should I just --

10        THE COURT:  Well, I guess part of it is, what is the

11   plaintiff's position on this idea that there was a

12   liquidation of the Bitcoins on the three exchanges that

13   mattered?  It's, you know, on the one hand we have the

14   stipulation that at all times the defendant had 200 Bitcoins,

15   and now that we have this assertion that there was this

16   liquidation on these exchanges.

17        So what -- what is your sense of -- what is your

18   sense in regard to that of -- is that demonstrably,

19   indisputably true? And if so, what do you think the legal

20   consequences of that are?

21        MR. LEIDER: You know, as you pointed out, Your

22   Honor, it's defendant that has continually raised this issue

23   about selling the Bitcoin, and it mistakenly believes that is

24   a defense to a claim for conversion.

25        That is the only reason we have been talking about

1    this.  We -- all we have to show as the plaintiff is that we

2    gave them the Bitcoin, even erroneously, and then a duty

3    arises under California law for them to return it for its

4    value.

5         The fact that they sold it, or think they sold it,

6    or sold it on five exchanges but only in parts and have a,

7    you know, buy/sell kind of business, absolutely irrelevant.

8         The question is whether we gave them the Bitcoin in

9    the first place, and whether they refused to give it back.

10   And they are the ones raising this as a defense, and it's not

11   a legal defense to the claim.  So I'm really not sure what to

12   make of it.  I think it's a question maybe the defense should

13   answer.

14        I do have a practical answer to your question, which

15   is if this is, in fact, a buy/sell business, what Bitpay did

16   is sold the Bitcoins and then turned around and took the

17   money and bought more Bitcoins, and then sold them and bought

18   more Bitcoins, and sold them and bought more Bitcoins, and

19   sold them with our money.

20        So even if factually it is true, these specific

21   Bitcoins were sold way back when, when we first gave them to

22   them or somewhere near then, they continuously have profited

23   from this cycle that they themselves cite by selling them,

24   buying new ones, selling them, buying new ones as the price

25   went up.

1        THE COURT:  But what if they had bought a piece of

2    art by, you know, Banksy or some up-and-coming artist, and

3    suddenly that piece of art was worth a fortune? Would you say

4    that you were entitled to the painting?  It just seems, you

5    know, if you are saying they actually sold them and they got

6    money, and then they did something with the money, what does

7    it matter whether they went out and bought other Bitcoins or

8    they went out and bought, you know, they bought anything that

9    turned out in hindsight to be an appreciating asset, or for

10   that matter, based on what the stock market has done, they

11   went out and just bought a broad-based mutual fund?  I'm not

12   sure what the significance is of being in the business of

13   buying and selling the Bitcoins, unless the point is that at

14   all times it was within their power to give you 200 Bitcoins.

15        MR. LEIDER: That is one of the points indeed, Your

16   Honor, and it's true today, as well.  I think it's a very

17   important fact.  And I think this all is kind of a, excuse

18   the expression, but a bit of a charade on behalf of the

19   defendants.

20        They have plenty of Bitcoins.  They have at every

21   point had plenty of Bitcoins.  It's as if they are saying to

22   my client, "I don't see that you can show me the dollar

23   bills, the exact dollar bills you gave me way back when.  You

24   can't have them back because I spent them on something, and I

25   have these other dollar bills now, and you are not entitled

1    to those because they are not the same dollar bills."

2         There is just no logic in that.  These are Bitcoins.

3    They are currency.  They are not like the Banksy piece of art

4    in any way.  They are indistinguishable from one another.

5    One is worth the same as another, and they are absolutely

6    fungible.

7         So this whole argument, this whole factual tracing

8    argument that they have been raising, and whether they have

9    told them or not, is really beside the point with respect to

10   my client.  My client wants 200 Bitcoins.  They know that

11   they, the defendants, have and have had 200 Bitcoins

12   throughout, and they refuse to give them back.

13        THE COURT:  If what we are arguing about is who

14   should benefit from the appreciation in the Bitcoins, then,

15   you know, that could be legally viewed in various ways, but

16   what about that there is this duty to mitigate?  I mean,

17   certainly, is there any -- your client, I presume, was in a

18   position to go out and buy 200 Bitcoins if it wanted 200

19   Bitcoins.  And if it had done so, then, yes, it would have

20   been -- there would still be damages, and there would still

21   be something for the two of you to argue about, but you

22   wouldn't be arguing about what really matters, which is the

23   appreciation in the Bitcoins.

24        MR. LEIDER: Yes, Your Honor.  I want to address

25   that, and squarely, mitigation is a defense.  It's not a

 1          burden that the plaintiff bears.  And it hasn't been raised

 2          in their pleadings, it hasn't been raised in any of the trial

 3          documents, and it's not our burden to show.

 4                    So on this record, there is no duty to mitigate, and

 5          we can talk about what we would have done, the factual point

 6          is we made the error in July 10 of 2015.  We didn't know that

 7          they had them until February 16th of 2017, that whole period

 8          of time.  We couldn't have done anything in that period.  We

 9          didn't even know.

10                    But even when they informed us, the value had risen

11          from $289 to $1,039, just in that period when we didn't know.

12          So we couldn't go out and just buy the same amount of

13          Bitcoins.  We had to spend four times as much to buy the same

14          amount of Bitcoins.

15                    THE COURT:  But again, the idea of mitigation, I'm

16          not necessarily saying then that that would negate all

17          damages, but it would have cut off the damages from that

18          point on to when you filed the Complaint, which -- or I

19          presume, I guess, that you will want the value of the

20          Bitcoins at the time of judgment.

21                    So, you know, on that sense, I agree with you that

22          it wouldn't have removed all damages, but it certainly would

23          be a limitation on the amount of damages that you could

24          receive.  But I understand your -- what you are really making

25          is a procedural argument of saying, even if this duty might

1    exist, it's just not here in this case.  So I -- I understand

2    that argument.

3              But I'll give you a chance to respond further

4    obviously, but let me just hear -- start hearing from the

5    defendant.

6              MR. LEIDER: Yes, Your Honor.

7              MR. KUNIN: Thank you, Your Honor.

8              And first of all, I want to thank the Court for

9    allowing me to appear by telephone, and my client appreciates

10   it, as well.

11             So first, I want to be, just to make sure we are

12   clear on the facts with regard to these exchanges and the

13   stipulation that Bitpay always had possession of 200 Bitcoin,

14   which was mischaracterized in the briefing by Ox Labs, that

15   the stipulation was that they had the Bitcoin to, quote

16   unquote, return.

17             Mr. Gallipi's affidavit, or declaration explains,

18   basically, the business model.  Bitpay is in the business of

19   allowing customers to intake payments by Bitcoin.  Those

20   customers are not interested in the Bitcoin, they are

21   interested in getting their cash when they make a sale.

22             So basically, you have somebody is buying, they want

23   to pay for Bitcoin, they go through Bitpay.  Bitpay then

24   liquidates the amount and then gets the cash over to the

25   customer.  And that is why in what are the trading accounts,

1    they get traded down to zero basically almost every day

2    unless transactions are occurring late.

3         Bitpay does have, and this is in the declaration,

4    does have its own accounts where it has its own investments.

5    This is like somebody who is into car dealing, probably deals

6    personally in cars, stock brokers personally deal in stocks,

7    but they are kept separate.

8         And so it's these -- I just want to be clear about

9    what was meant by Bitpay does have Bitcoin, and other

10   Bitcoin, and always had other Bitcoin, but not in these

11   accounts that are very fluid, and are basically purchase and

12   sale on a consistent, ongoing basis.  And as addressed during

13   summary judgment, there is no way to connect purchases and

14   sales and purchases and sales.  And we actually don't think

15   it is necessary to show that the account zeroed out on a

16   particular period of time, but the reality is that they did,

17   which causes a complete disconnect from any benefit.

18        So that leads me to a comment the Court just made,

19   which is, or question about, you know, who should enjoy the

20   appreciation and the value of the Bitcoin?  Well, the point

21   is that Bitpay has not at all benefited from the appreciation

22   in the Bitcoin. Only the plaintiff is seeking to benefit from

23   the appreciation as a result of its own error, even though

24   there is no evidence that Bitpay had any ongoing benefit from

25   that erroneous Bitcoin.

```
 1              And related to that, and I -- this is consistent
 2        through the briefing, and I see in the summary judgment
 3        order, as well as the tentative order, I still think there is
 4        a misunderstanding over what the payment that was tendered to
 5        the plaintiff was.
 6              It was not a settlement offer.  It was very clear on
 7        its face, and it's attached to the summary judgment briefing,
 8        that it was not a settlement offer.  It was an unconditional
 9        payment.  It's their money.  It's still their money.  It's --
10        there is an error, we found it, we have disclosed it to you.
11        This is what the value was on that day according to the
12        trading on Your Exchange, which that evidence is in the
13        summary judgment evidence, and that is all we got.  So we are
14        giving you everything that we got.
15              Bitpay did not at all enjoy the appreciation in the
16        Bitcoin.  What the plaintiff is trying to do is say, just
17        because they happen to have other Bitcoin that was separately
18        traded, separately kept, um, just give us that Bitcoin.
19              And I think the art example that you gave is a good
20        one.  What if it was something else? What if it wasn't
21        Bitcoin? It just happens to be Bitcoin, so they want to get
22        that.  Well, almost every case both parties cited that talk
23        about where there is restitution, and they talk about like
24        quality and value, um, that there is one particular case that
25        was cited, it was the old, it's over 100 years old, um, the
```

1    plaintiff cited the *Richardson* case for the United States

2    Supreme Court, and that one had this very key word in it

3    "value".  It had to do with exchange of stock certificates.

4         And one stock certificate had the same value as

5    another stock certificate.  And what is going on here is kind

6    of a conflation in the plaintiff's briefing between what is

7    fungible and then what may be a tangible, you know, a

8    television, a desk, a car, a piece of art, that I took and I

9    can actually identify and return to you.  And they are kind

10   of combining them together to come up with this argument that

11   a Bitcoin is a Bitcoin and it doesn't matter what a Bitcoin

12   is.  And that is just not true under what the cases are

13   talking about with regard to value.

14        A dollar in 2015 was a dollar in 2017, is a dollar

15   now.  A dollar is always a dollar.  That is fungible.  A

16   Bitcoin, maybe this morning and maybe this afternoon, might

17   be comparable.  And it doesn't matter which one I give you,

18   they both, on the same day, they both have the same value,

19   but a Bitcoin in 2015 is not a Bitcoin in 2017.

20        And so what has occurred here is that due to an

21   error that was caught by my own client who was honest about

22   it and disclosed it, is the burden with a risk of investment

23   has been unwittingly shifted to my client that they didn't

24   ask for.

25        And they continued on their trading, based on

1    balances that they had, liquidating out those balances on an

2    ongoing basis.  And now they are basically being told not

3    only do we appreciate the error that you made, but we also

4    want to thank you for undertaking the burden or undertaking

5    the risk of investment on our behalf and continuing to take

6    that risk on our behalf.  And that just doesn't make any

7    sense logically or under the law that has been cited by the

8    parties.

9          This is not of like quality and value.  This is pure

10   punishment to my client for being the innocent recipient of a

11   Bitcoin and doing the right thing by then disclosing the

12   existence of the error, and then tendering what they profited

13   on that day.  And again, it's not a settlement offer, it was

14   a payment, unconditional, no release, no nothing, it's your

15   money, and it's still their money if they want it.

16         So we are very frustrated, because again, it's one

17   thing if the Bitcoin -- I think Your Honor mentioned this in

18   one of the cases, the *Katt* case, the *Horn v. Katt* case, if

19   Bitcoin had gone down, I don't think we would be here arguing

20   about how much money Ox Labs owes to Bitpay.

21         And that kind of calls out the logical nature of

22   what occurred here. There was an error.  Both parties admit

23   there was an error.  There was trading.  There was trading

24   that day.  There ultimately is a zero out in all three

25   exchanges a couple of days later.  It's a complete

1    disconnect.  Chain of custody is another way to say it.

2    There is just a complete disconnect.  Bitpay in the end has

3    not enjoyed the appreciation of the Bitcoin that was at issue

4    in the error, and there has been no evidence to the contrary.

5          And then one other thing I would like to point out

6    is there is also no evidence, nor could there be

7    nonspeculative evidence, that Ox Labs itself would have still

8    had the Bitcoin today.  They are an exchange.  We don't know

9    if that day they would have sold it or the next day or the

10   day after or the day after, or the next year.

11         And so what happens is that the error pops up, and

12   they basically say, "Thank you for taking the burden of risk.

13   We appreciate it.  Sorry we made a mistake.  But we

14   appreciate you, Bitpay, for making all this money for us."

15   And it just doesn't make sense to us.

16         THE COURT:  Thank you.

17         In regard to -- let me hear from Ox Labs.  You know,

18   in regard to that, you know, there is this sense in the law

19   that in the absence of proof that somebody would have sold

20   shares at the height of the market, then that is not the

21   standard that is supposed to be used, why would that not be

22   applicable here with Ox Labs, or at least as a minimum that

23   it wouldn't be something that would have to be determined by

24   a trier of fact?

25         MR. LEIDER: Your Honor, if we were asking for

1    damages first and foremost, I agree that would be a question.

2    This is about 200 Bitcoin back when we made the error, 200

3    Bitcoin when they told us about it, and 200 Bitcoin today.

4    In an action of this sort we are entitled to return of the

5    property and the detention value, the amount of money we lost

6    because it was wrongfully detained.

7         And under the California law, I should cite you to

8    the statute, I apologize for not doing it, California Code of

9    Civil Procedure Section 667, the proper form of judgment in a

10   case like this is either return of the property or its value

11   in the alternative.  It's an alternative judgment.  And it's

12   up to the plaintiff to choose which of the two forms of

13   relief it wishes to get.

14        We have elected, we've told you, we have been clear,

15   we don't have to, we can wait until after trial, we can do

16   the whole damages trial and waste everybody's time, but we've

17   told you in advance that what we want is 200 Bitcoins.

18        Now, I can tell you this, it's not in the

19   declaration, but I can tell you my client back in the day if

20   the value had declined would have wanted 200 Bitcoins.  It

21   wanted its property back.  If they went down in value, it

22   wanted 200 lesser-valued Bitcoins.  It didn't want Bitpay's

23   version of what those Bitcoins are worth.

24        And the alternative judgment protects that.  That is

25   why the statute is framed that way.  It gives the plaintiff

1    the right to choose.  If it went up in value, the plaintiff

2    gets to choose to get the property back instead of taking the

3    damages for detention.

4         THE COURT:  All right.  And how would you deal,

5    then, with the obvious point here of that it was Ox Labs'

6    error, or technically Ox Labs' subsidiary's error, but you

7    know what I mean.  Part of the answer of course is saying

8    it's a strict liability statute.  That is just the way it

9    shakes out.

10        Is there any -- and that is, you know, I understand

11   that argument, it's what you are saying in your brief, but is

12   there anything else that you have to say about why this

13   result is not as unfair as, you know, Mr. Kunin was just

14   making it out to be?

15        MR. LEIDER: Very simply, Your Honor, back in 2017

16   when they told us about the error, that Bitcoin wasn't worth

17   nearly what it is worth today, but they said, "Look, under

18   that alternative judgment that you are entitled to, you are

19   only going to get this, you are not going to get this which

20   you are entitled to."  We were entitled to choose.  They

21   don't make that choice for us.

22        And by choosing to offer us $57,000, which he says

23   they mailed to us, and we were obliged to accept because that

24   is all we are entitled to, he's basically ignoring the

25   statute, which says, "No, you are entitled either to that or

1       return of the property."

2                 And so that whole time, from back then when they

3       told us about this, they have refused to give us 200 Bitcoin.

4       They could -- they are the ones that could have mitigated the

5       harm.  They could have given us 200 Bitcoin when they were

6       worth much less, and they can give them to us today.  They

7       might go down in value after trial, I don't know.  My client

8       wants just 200 Bitcoin, whatever fluctuations, changes in

9       value.  Dollars change in value.  That argument is silly.

10      You know, against the yuan or the peso or any other currency,

11      the dollar changes value every day by the second.

12                So it is not true that dollars are distinguishable

13      from Bitcoin on that basis.  They both fluctuate in currency

14      markets.  That is exactly what this is.  This is a form of

15      currency.  It happens to be virtual currency.

16                THE COURT:  All right.  Mr. Kunin, I'll hear from

17      you and then I'll give the last word, if there is anything

18      left to say at that point, to the plaintiff.

19                MR. KUNIN:  I just --

20                THE COURT:  Go ahead.

21                MR. KUNIN:  I'm sorry, Your Honor.

22                I just want to emphasize that this word "return"

23      keeps popping up and it's a misnomer.  We just want our

24      property back.  We just want it returned.  Again, we are not

25      talking about the piece of artwork.  We are not talking about

1    a car.  We are not talking about an antique desk.  We are not

2    even talking about, "I gave you a stock certificate

3    yesterday, can you please give it back to me today?"  That is

4    not what we are talking about.

5            The cases are extraordinarily clear.  It says it

6    over and over again.  The U.S. Supreme Court says it.  The

7    California cases we cited says it.  That *Horn vs. Katt* case

8    says it.  It's got to be of like quality and value.

9            And if they just get to say, quote unquote, "We want

10   our property back," that property, first of all, it's gone.

11   There is no connection to that error, as I said earlier, no

12   evidence whatsoever of a connection of any ongoing value to

13   Bitpay that arises in any way from that error that occurred

14   in 2015.  And yet, my client's being asked to reach into its

15   other bank of assets to give them 200 Bitcoin because they

16   happen to own other Bitcoin. It just doesn't make sense to us

17   under the law.

18           THE COURT:  All right.  But you are saying that you

19   sold that Bitcoin, what -- in a sense you are in a way

20   undercutting the point that you are making with -- you know,

21   Ox Labs, out of fairness, is not asking here for the

22   particular Bitcoin that were linked to particular block

23   chains.  And in fact, the parties have always consistently

24   admitted that it's just that whole idea -- way of looking at

25   it is just impossible.  But, you know, here, you know, it's

1    more like, you know, you are looking at it as a commodity,

2    which is consistent with how cyber currencies, on one

3    instance, at least, were viewed.

4            I completely understand your point that there is a

5    difference between viewing Bitcoins on whether they are

6    tangible or intangible is not the same legal question on

7    whether they are a commodity or not.

8            But here, you know, it isn't as if Ox Labs said back

9    in 2017, "Give us our Bitcoin."  Rather, it's just, "Give us

10   any Bitcoin.  Give us 200 Bitcoins."  You know, they were

11   saying, "Give us 200 bushels of coal."  It doesn't have to be

12   the exact same coal.  It's just, you know, "We gave you --

13   you had anthracite coal and now we want anthracite coal

14   back."

15           So I guess in that sense, what is your response on

16   that where they were saying they would have been happy in

17   2017 to have gotten any Bitcoin and were not looking to get,

18   you know, the very specific Bitcoin in some metaphysical

19   sense that was linked to some particular block chain that

20   they had previously deposited in error with your client?

21           MR. KUNIN:  Your Honor, I think it's actually a

22   simple answer, and I thought I answered part of that, but not

23   as fully as you asked it.

24           Bitpay has not to this day been enriched by 200

25   Bitcoin.  So let's say it keeps a consistent balance, just

1    for sake of argument, of 1,000 Bitcoin, and as a result of

2    this error, now it's got a balance of 1200 Bitcoin.  And then

3    they trade and sell and trade and sell and trade and sell,

4    and then today they are still enriched by that extra 200

5    Bitcoin, then that argument may come into play.

6           But here, what they do with the Bitcoins is they

7    actually sell and liquidate them, and then -- and as

8    mentioned, ultimately zeroed out within days.  I mean, all

9    three accounts were zeroed out.  The accounts get zeroed out

10   very frequently, almost on a daily basis.  But there was even

11   one day where all three were zeroed out on the same time.

12          So they are just not enriched by the extra 200

13   Bitcoin, which is why I keep going back to, what they are

14   after is saying, you just happen to have other Bitcoin, your

15   overall balance has not been affected.  There is no evidence

16   of that whatsoever, that their balance today is affected by

17   the error.  Anything other than the 57,000 they realized from

18   selling 200 more Bitcoin than they should have sold. And that

19   is why they tendered that amount.

20          The -- I lost my train of thought here.  Oh, I was

21   going to give the example of, you know, what if they didn't

22   have the other Bitcoin?  Would the ask here be, "Well, you

23   know, we understand that you are the innocent party here who

24   didn't commit the error, but would you mind going out and

25   spending $300 million and buying 200 Bitcoin so you can give

1    it to us?"  And that is really what the ask here, just

2    because we happen to have 200 other Bitcoin.  If we didn't

3    have it, under their theory we would have to now spend

4    $3 million to go get Bitcoin back that we sold at a time that

5    the prices were around 57 or so thousand dollars.

6          THE COURT:  All right.  I understand that argument,

7    which of course anyone would, including laymen, but the

8    question is whether that is consistent with the California

9    law.

10          I'll give Ox Labs the last word as the plaintiff.

11          MR. LEIDER: The last point is the critical one you

12    just made, Your Honor.  If this were solely an unjust

13    enrichment case, the question would be what the defendant has

14    been enriched by, and we would look at how much they made by

15    wrongfully possessing our property.

16          But our primary claim in this case is a legal one,

17    not an equitable one.  It's for conversion.  And under

18    California law, even if -- even if some of us might think

19    it's unfair, the law says if you have the property of

20    somebody else, even unwittingly, and you sell it, you are

21    liable to the plaintiff.  And the plaintiff is entitled

22    either to the property or to its value in the alternative.

23          So all these equitable arguments, "Oh, we didn't

24    make a dime.  We don't have any money.  We only made $57,000,

25    and we sent it to you already."  That might fly when it comes

1    to the unjust enrichment claim.  But when it comes to the

2    conversion claim, which we keep veering away from, the law is

3    clear, and it doesn't take into account those equities that

4    he keeps bringing up.

5            I would gladly argue against them, but that is not

6    what the law looks at.  The law looks at whether I had a

7    right to possess it and they denied me the right to possess

8    it.  And that is clear and stipulated in this case.

9    Liability is established as the tentative shows, the remedy

10   is up to the plaintiff.

11           THE COURT:  All right.  Thank you, counsel.  The

12   matter is taken under submission.

13                    *****    *****    *****

14

15   I certify that the foregoing is a correct transcript from the

16   record of proceedings in the above-titled matter.

17

18

19

20   ---------------------------

21

22   Amy C. Diaz, RPR, CRR              April 17, 2020

23   S/  Amy Diaz

24

25